# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Nancy Lee Bulick,                   :              Case No. 5:13 CV 1432
    Plaintiff,                     :
                                   :
                                   :
v.                                  :
                                   :
Commissioner of Social Security,    :              **REPORT AND**
    Defendant,                     :              **RECOMMENDATION**

## I. INTRODUCTION

Plaintiff Nancy Lee Bulick ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§§ 416(I), 423, and 1381 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 15 and 16) and Plaintiff's Reply (Docket No. 17). For the reasons that follow, the Magistrate recommends that the opinion of the Commissioner be affirmed in part and reversed and remanded in part.

1

## II. PROCEDURAL BACKGROUND

On August 31, 2009, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(I) and 423 (Docket No. 14, p. 130 of 579). Several days later, on September 9, 2009, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 14, p. 134 of 579). In both applications, Plaintiff alleged a period of disability beginning January 31, 2007 (Docket No. 14, pp. 130, 134 of 579). Plaintiff's claims were denied initially on January 5, 2010 (Docket No. 14, pp. 106, 110 of 579), and upon reconsideration on April 24, 2010 (Docket No. 14, pp. 115, 117 of 579). Plaintiff thereafter filed a timely written request for a hearing on June 17, 2010 (Docket No. 14, p. 124 of 579).

On December 16, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Virginia Robinson ("ALJ Robinson") (Docket No. 14, pp. 31-101 of 579). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 14, pp. 79-98 of 579). ALJ Robinson found Plaintiff to have a severe combination of scoliosis, joint arthrosis, shoulder impingement syndrome, degenerative disc disease, and tendinitis with an onset date of January 31, 2007 (Docket No. 14, p. 18 of 579). Plaintiff's additional alleged impairments, specifically depression and anxiety, were found to be not severe (Docket No. 14, p. 19 of 579).

Despite these limitations, ALJ Robinson determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of her decision (Docket No. 14, p. 25 of 579). ALJ Robinson found Plaintiff had the residual functional capacity to perform sedentary work with the following additional limitations:

1. Stand and walk for a total of four hours per day
2. Lift no more than five pounds

2

3.      Occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds

4.      Frequently stoop but only occasionally kneel, crouch, or crawl

5.      Unlimited reaching in all directions but only occasional overhead reaching with right upper extremity

6.      Occasional use of hand-held assistive device for ambulation

7.      No exposure to workplace hazards such as unprotected machinery and heights

8.      No rapid production or pace work

(Docket No. 14, p. 20 of 579). Plaintiff's request for benefits was therefore denied (Docket No. 14, p. 25 of 579).

On June 28, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading, Plaintiff alleged that the ALJ erred by failing to: (1) abide by the treating physician rule; (2) recognize Plaintiff's depression and anxiety as severe impairments; (3) give Plaintiff's subjective statements full credibility; and (4) make a proper determination at Step Five (Docket No. 15). Defendant filed its Answer on September 5, 2013 (Docket No. 13).

### III. FACTUAL BACKGROUND

**A.      THE ADMINISTRATIVE HEARING**

An administrative hearing convened on December 16, 2011, in Akron, Ohio (Docket No. 14, pp. 31-101 of 579). Plaintiff, represented by counsel Bobbie Marsh,[1] appeared and testified (Docket No. 14, pp. 39-79 of 579). Also present and testifying was VE Mary Beth Kopar ("VE Kopar") (Docket No. 14, pp. 79-98 of 579).

---

[1] Note that Plaintiff is now represented by attorney Diane R. Newman.

3

### 1.   PLAINTIFF'S TESTIMONY

Plaintiff testified that, until October 2011, she lived in her own home with her two adult children (Docket No. 14, p. 41 of 579). After suffering a home foreclosure, Plaintiff moved in with her mother (Docket No. 14, p. 40 of 579). Prior to her alleged disability, Plaintiff worked several jobs, including: (1) data entry clerk for Akron Auto Auctions; (2) office worker for First National Restoration Contract; (3) packager for Marathon Staffing Group; (4) quality control officer for Shearer's Foods; (5) packager/supervisor for Harry London Candies; (6) clerk for Firestone Star Market; and (7) aide at the Mayflower Nursing Home (Docket No. 14, pp. 41-49 of 579). When asked what currently prevented her from working, Plaintiff claimed it was her back, leg, and shoulder pain (Docket No. 14, pp. 50-52 of 579).

Plaintiff gave testimony concerning a number of her alleged impairments, including her back, leg, and shoulder pain, as well as her depression and anxiety (Docket No. 14, pp. 39-79 of 579). With regard to her back pain, Plaintiff stated she has a "big lump" in her back that swells and she suffers spasms that can last two to three days (Docket No. 14, pp. 50-51 of 579). Plaintiff testified that she cannot sit back in a chair or lean against a wall due to the tenderness of the lump (Docket No. 14, p. 53 of 579). She indicated that she usually experiences at least two sleepless nights per week because she cannot find a comfortable position due to the pain (Docket No. 14, p. 62 of 579). Plaintiff testified that she has had epidurals and trigger point injections in the lump in an attempt to ease the pain (Docket No. 14, pp. 74-76 of 579).

Plaintiff's leg pain is directly tied to her back pain (Docket No. 14, pp. 50-51 of 579). She described the pain as stabbing and noted that she sometimes has to use a cane (Docket No. 14, p. 65 of 579). With regard to her shoulder pain, Plaintiff testified that she was scheduled for surgery in October

2011, but chose not to go through with it given the simultaneous foreclosure of her home (Docket No. 14, pp. 51-52 of 579). She noted that her shoulder "aches something horrible," and prevents her from carrying objects (Docket No. 14, p. 52 of 579).

When asked about her depression and anxiety, Plaintiff testified that she had been treated for years with anti-depressants (Docket No. 14, p. 59 of 579). She reported that she cried at "the drop of a hat," and took Celexa and Xanax to help manage her symptoms (Docket No. 14, pp. 59-60 of 579). Plaintiff indicated that she had migraines sporadically and that she would not have any for months, and then suddenly experience headaches once or twice a week (Docket No. 14, p. 61 of 579).

Plaintiff also provided testimony about her limitations and activities of daily living. Plaintiff indicated that she cannot do her own housework, but could do laundry if someone took the clothes to the washer and dryer (Docket No. 14, p. 53 of 579). She occasionally goes grocery shopping, but never by herself (Docket No. 14, p. 57 of 579). She does not cook and only eats "really easy stuff" such as frozen or canned foods (Docket No. 14, p. 57 of 579). She spends most of her day lying or sitting down watching television (Docket No. 14, p. 54 of 579). She reads very little (Docket No. 14, p. 57 of 579). Plaintiff testified that, on average, she has three days per week when she can do nothing but lie down or sit in a chair and alternate heat and ice on her back (Docket No. 14, p. 62 of 579). She estimated that she could stand for fifteen to twenty minutes (Docket No. 14, p. 64 of 579), go up and down stairs if she used the rail (Docket No. 14, pp. 64-65 of 579), sit for short periods of time (Docket No. 14, p. 66 of 579), walk a block and a half (Docket No. 14, p. 67 of 579), and lift no more than five pounds (Docket No. 14, p. 68 of 579). Plaintiff also testified that she takes sixty milligrams of extended release morphine twice per day (Docket No. 14, p. 76 of 579).

5

2.    VOCATIONAL EXPERT TESTIMONY

Having familiarized herself with Plaintiff's file and vocational background prior to the hearing,

the VE described Plaintiff's past work as a fast food worker as unskilled and light, as a packager as

unskilled and light/medium, as a data entry clerk as semi-skilled and sedentary, as an office clerk as

semi-skilled and light, and as a packaging supervisor as skilled and medium/heavy (Docket No. 14, pp.

80-81, 88 of 579). ALJ Robinson then posed her first hypothetical question:

> A hypothetical of an individual with the same age, educational, and work background as
> the claimant; able to perform light work; occasionally climb ramps or stairs; never climb
> ladders, ropes, or scaffolds; frequent stooping; occasional kneeling, crouching, or crawling;
> reaching in all directions and overhead with the left is unlimited, but reaching overhead
> with the right shoulder is limited to only occasional; avoid exposure to work place hazards,
> such as unprotected machinery and unprotected heights – would the Claimant be able to
> perform any of her past work with those limitations?

(Docket No. 14, p. 83 of 579). The VE indicated Plaintiff could perform her past work as a data entry

clerk and office worker (Docket No. 14, p. 88 of 579).

For her second hypothetical, ALJ Robinson asked the VE:

> The – hypothetical number two is sedentary work, except – and, it's kind of a – between
> sedentary and light – an individual that can lift up to 10 pounds occasionally; stand and
> walk for approximately four hours per day, and sit for approximately six hours per eight-
> hour work day, with normal breaks; occasionally climb ramps or stairs; never climb
> ladders, ropes, or scaffolds; frequent stooping; occasional kneeling, crouching, and
> crawling; unlimited reaching in all directions; and, unlimited overhead reaching with the
> left arm, but limited overhead reaching, with the right arm, to occasional; limited to jobs
> that could be performed while using a handheld assistive device occasionally for
> ambulation; avoiding all exposure to work place hazards, such as unprotected machinery
> and unprotected heights.
>
> Are there any of the Claimant's prior jobs that she would be able to do, with that . . .
> occasionally for ambulation, not – not on a regular basis for ambulation; but, on some days,
> she might need to use a handheld device occasionally, when she ambulated – when she
> walked – occasionally, for walking.

(Docket No. 14, p. 89 of 579). VE Kopar indicated Plaintiff could still do the data entry and office

6

clerk positions (Docket No. 14, p. 89 of 579). For her third hypothetical, ALJ Robinson kept all

restrictions of hypothetical two but restricted lifting to only five pounds (Docket No. 14, pp. 89-90 of

579). With this restriction, the VE indicated that the hypothetical individual would not be able to

perform any of Plaintiff's past work (Docket No. 14, p. 90 of 579).[2]

> The ALJ posed a fourth hypothetical:
>
> And the last hypothetical is the same as the hypothetical that I just provided – limited to
> five pounds; sedentary work, but could walk up to four hours per day; occasional climbing
> ramps and stairs; never climb ladders, ropes, or scaffolds; frequent stooping, but only
> occasional kneeling, crouching, and crawling; limited overhead reaching with right
> shoulder only, but unlimited reaching, otherwise; the handheld assistive device
> occasionally for walking; but, also, missing four days or more per month due to . . .
> medical problems.
>
> Would there be any of her prior jobs that she could perform?

(Docket No. 14, p. 90-91 of 579). The VE responded in the negative (Docket No. 14, p. 91 of 579).

The VE also indicated that, with these restrictions, there were no other jobs in the national economy

that the individual could perform (Docket No. 14, p. 91 of 579).

ALJ Robinson then went back to her third hypothetical and added one additional restriction

limiting the individual to no rapid production or pace work (Docket No. 14, p. 91 of 579). Based on

these limitations, VE Kopar indicated that the individual could still perform the office clerk job as well

as other work in the national economy, including: (1) ticket checker, listed under DOT[3] 219.587-010,

for which there are 100,000 positions nationally and 1,000 in the State of Ohio; (2) order clerk, listed

under DOT 209.567-014, for which there are 300,000 positions nationally and 13,000 in the State of

---

[2] There was some confusion as to whether the office clerk position, as performed by Plaintiff,
actually required lifting (Docket No. 14, p. 90 of 579). The VE testified that if in fact the office clerk
position did not require any lifting, the hypothetical individual could still perform this job, even with the
five-pound limitation (Docket No. 14, p. 90 of 579).

[3] Dictionary of Occupational Titles.

Ohio; and (3) surveillance systems monitor, listed under DOT 379.367-010, for which there are 100,000 positions in the national economy and 500 in the State of Ohio (Docket No. 14, p. 92 of 579). The VE indicated that these positions would also be available if walking and standing were limited to two hours per day (Docket No. 14, p. 92 of 579).

Finally, ALJ Robinson questioned whether, under any of the provided hypotheticals, there would be any work available in the national economy if an individual had to miss four or more days of work per month (Docket No. 14, p. 93 of 579). The VE responded in the negative (Docket No. 14, p. 93 of 579). During cross examination, Plaintiff's counsel questioned whether, in any of the given hypotheticals, an individual could be off task twenty percent of the time and still maintain the position (Docket No. 14, p. 93 of 579). Again, the VE responded in the negative (Docket No. 14, p. 93 of 579).

## B.  MEDICAL RECORDS

### 1.  DR. P.L. SONI, MD

Plaintiff first saw Dr. P.L. Soni, MD ("Dr. Soni") on April 23, 2008, for a consultation (Docket No. 14, p. 387 of 579). Dr. Soni diagnosed Plaintiff with tendinitis of the right shoulder and wrist, degenerative disc disease of the lumbar spine, scoliosis of the spine, and right sciatica (Docket No. 14, p. 387 of 579). Plaintiff was given an epidural injection (Docket No. 14, p. 387 of 579). Plaintiff returned to Dr. Soni on April 30, 2008, for a second epidural injection, after reporting relief from the first injection (Docket No. 14, p. 388 of 579). On May 7, 2008, Plaintiff received a third epidural and reported that the injections had helped her immensely (Docket No. 14, p. 388 of 579).

### 2.  DR. SON DANG, MD

Plaintiff's first record with her general physician, Dr. Son Dang, MD ("Dr. Dang") was on March 15, 2006 (Docket No. 14, p. 423 of 579). Aside from general malaise, Plaintiff only initially

complained of depression and anxiety (Docket No. 14, pp. 414-23 of 579). During a visit on February 28, 2008, Plaintiff complained of lower back pain, occurring two times per week (Docket No. 14, p. 413 of 579). On April 17, 2008, Dr. Dang prescribed Plaintiff Percocet (Docket No. 14, p. 410 of 579). On November 3, 2009, Plaintiff visited Dr. Dang in order to obtain medical clearance for bladder surgery (Docket No. 14, p. 313 of 579). Plaintiff complained of depression and anxiety (Docket No. 14, pp. 313, 315 of 579).

Plaintiff returned to Dr. Dang on January 15, 2010, still complaining of depression and anxiety (Docket No. 14, p. 312 of 579). An examination of her lumbosacral spine revealed no tenderness to palpation, swelling, or edema, and normal strength and tone (Docket No. 14, p. 312 of 579). Plaintiff saw Dr. Dang again on April 8, 2010, and July 7, 2010 (Docket No. 14, pp. 480, 477). Each time, Dr. Dang noted that Plaintiff's thoracic and lumbar spine examinations were normal (Docket No. 14, pp. 480, 477 of 579). During the April 2010 appointment, Dr. Dang did report that an examination of Plaintiff's left shoulder was normal aside from some limitation with overhead reaching (Docket No. 14, p. 480 of 579). On September 20, 2010, Dr. Dang made this same finding with regard to Plaintiff's *right* shoulder (Docket No. 14, p. 468 of 579). On October 1, 2010, Dr. Dang reported that Plaintiff's right shoulder had some mild tenderness but was otherwise normal (Docket No. 14, p. 465 of 579).

Plaintiff did not return to Dr. Dang until August 5, 2011 (Docket No. 14, p. 456 of 579). During this appointment, Dr. Dang found Plaintiff had normal lumbosacral spine movements with some limitation with flexion and extension (Docket No. 14, p. 456 of 579). Plaintiff also had some moderate flank pain and medial lower back tenderness (Docket No. 14, p. 456 of 579).

### 3.    DR. ARSAL AHMAD, MD

Plaintiff was referred to pain management physician Dr. Arsal Ahmad, MD ("Dr. Ahmad") on

October 10, 2008, for a consultation (Docket No. 14, p. 358 of 579). Plaintiff complained of lower back pain, which she rated as an eight out of a possible ten (Docket No. 14, p. 358 of 579). Plaintiff was able to transfer from sitting to standing, heel-toe walk, and squat/return without any difficulty (Docket No. 14, p. 359 of 579). Dr. Ahmad did not see signs of any significant scoliosis (Docket No. 14, p. 359 of 579). Plaintiff was diagnosed with lumbar spondylosis/degenerative disc disease with associated scoliosis, lateral recess/neuroforaminal narrowing at the L2-3 and L3-4 vertebrae, and displacement of the existing L3 nerve root (Docket No. 14, p. 359 of 579).

On October 27, 2008, Plaintiff underwent a trial of transforaminal epidural injections (Docket No. 14, p. 366 of 579). By November 10, 2008, Plaintiff reported modest improvement and rated her pain as a three out of a possible ten (Docket No. 14, pp. 363, 365 of 579). On December 16, 2008, Plaintiff presented with severe lower back pain with radiation into her lower extremities (Docket No. 14, p. 357 of 579). Dr. Ahmad noted that Plaintiff had a moderate restriction of lumbar mobility with a tenderness to palpation over her lumbar paraspinals and vertebral bodies, as well as scoliosis (Docket No. 14, p. 357 of 579). Plaintiff was diagnosed with lumbar degenerative disc disease (Docket No. 14, p. 357 of 579).

Plaintiff did not return to Dr. Ahmad until April 9, 2009, when she presented with increasing lower back pain that was radiating into her left lower extremity (Docket No. 14, p. 355 of 579). Plaintiff rated her pain as a nine out of a possible ten (Docket No. 14, p. 355 of 579). Dr. Ahmad noted that Plaintiff had tenderness to palpation over her lumbar paraspinals and a moderate restriction in lumbar mobility with pain provocation and extension (Docket No. 14, p. 355 of 579). In addition to lumbar degenerative disc disease, Plaintiff was also diagnosed with myofascial pain (Docket No. 14, p. 355 of 579). By May 2009, Plaintiff's pain had decreased to a six out of a possible ten (Docket No. 14,

p. 353 of 579). By June 2, 2009, Plaintiff rated her pain as a five out of a possible ten (Docket No. 14, p. 274 of 579). During this appointment, Plaintiff also reported frequent episodes of severe, debilitating right lower extremity pain (Docket No. 14, p. 274 of 579). Upon examination, Dr. Ahmad noted that Plaintiff had a mild restriction of lumbar mobility and tenderness to palpation bilaterally over her lumbar paraspinals and left thoracic paraspinals (Docket No. 14, p. 274 of 579). Plaintiff's diagnosis remained unchanged (Docket No. 14, p. 274 of 579).

On July 28, 2009, Plaintiff noted that her pain had increased to a seven out of a possible ten (Docket No. 14, p. 270 of 579). She simultaneously reported an improvement from medication and the trigger point injections she received during each visit with Dr. Ahmad (Docket No. 14, p. 270 of 579). In September 2009, Plaintiff was diagnosed with multi-level lumbar degenerative disc disease with severe scoliosis and myofascial pain syndrome (Docket No. 14, p. 266 of 579). By October 2009, Plaintiff was reporting "excellent benefit" from the trigger point injections (Docket No. 14, p. 345 of 579). Plaintiff was also participating in physical therapy which was accompanied by electrical stimulation, which Plaintiff reported was helpful (Docket No. 14, p. 345 of 579). Dr. Ahmad noted that Plaintiff had mild to moderate restriction of lumbar mobility, taut bands of muscle palpable along her left thoracic paraspinals and upper lumbar paraspinals, and a tenderness over her right lumbar paraspinals (Docket No. 14, p. 345 of 579). Plaintiff rated her pain as a six out of a possible ten (Docket No. 14, p. 345 of 579).

By December 2009, Plaintiff was complaining of severe lower back pain with lower extremity spasms (Docket No. 14, p. 342 of 579). Plaintiff rated her pain as a ten out of a possible ten, although she indicated that the medications did help her overall function and quality of life (Docket No. 14, p. 342 of 579). Dr. Ahmad noted that Plaintiff had a severe restriction of lumbar mobility (Docket No.

11

14, p. 342 of 579). He diagnosed Plaintiff with lumbar degenerative disc disease with spinal stenosis, chronic lower extremity myospasms, and myofascial pain syndrome (Docket No. 14, p. 342 of 579). Plaintiff continued to report a severe level of pain through early January 2010 (Docket No. 14, p. 340 of 579), but by January 29, 2010, Plaintiff reported that her pain was a five out of a possible ten (Docket No. 14, p. 338 of 579). Plaintiff noted that her spasms decreased with physical therapy and medication (Docket No. 14, p. 338 of 579). Plaintiff was diagnosed with lumbar degenerative disc disease, lumbar spinal stenosis, chronic lower extremity myospasms, and myofascial pain syndrome (Docket No. 14, p. 338 of 579).

On February 26, 2010, Plaintiff reported left-sided lower back pain with intermittent radiation into her lower limbs (Docket No. 14, p. 336 of 579). She noted that she had a good response to the trigger point injections and physical therapy and rated her pain as a five out of a possible ten (Docket No. 14, p. 336 of 579). Plaintiff also reported that the medications were helping her overall functioning (Docket No. 14, p. 336 of 579). Dr. Ahmad noted that Plaintiff had mild swelling of her lower back and significant tenderness upon palpation with a moderate restriction of lumbar mobility and pain with both flexion and extension (Docket No. 14, p. 336 of 579). Plaintiff's diagnosis remained unchanged (Docket No. 14, p. 336 of 579).

In March 2010, Plaintiff rated her pain as a seven out of a possible ten and reported numbness and tingling in her right lower extremity (Docket No. 14, p. 443 of 579). Plaintiff stated that she had not been to physical therapy in two weeks because it aggravated her symptoms (Docket No. 14, p. 443 of 579). Plaintiff had mild to moderate restriction of lumbar mobility, pain provocation on extension, and severely taut bands of muscle palpable along her left lumbar and thoracic paraspinals (Docket No. 14, p. 443 of 579). This continued through September 2010 (Docket No. 14, pp. 436-42 of 579). On

12

October 6, 2010, Plaintiff reported lower back pain that was not relieved by the trigger point injections (Docket No. 14, p. 434 of 579). She also complained of pain in her right shoulder (Docket No. 14, p. 434 of 579). Dr. Ahmad noted Plaintiff had tenderness over her right acromioclavicular ("AC") joint, but she had a good range of motion with only mild crepitus (Docket No. 14, p. 434 of 579). In addition to her back issues, Dr. Ahmad diagnosed Plaintiff with likely underlying AC joint arthritis and rotator cuff tendinitis (Docket No. 14, p. 434 of 579). In December 2010, Dr. Ahmad diagnosed Plaintiff with right shoulder pain secondary to advanced glenohumeral arthritis and a partial tear of her supraspinatus tendon (Docket No. 14, p. 433 of 579).

Plaintiff returned to Dr. Ahmad on February 8, 2011, and underwent a right shoulder corticosteroid injection (Docket No. 14, p. 430 of 579). On February 24, 2011, Plaintiff reported no significant benefit from the injection and Dr. Ahmad noted a mild to moderate restriction of Plaintiff's right shoulder mobility (Docket No. 14, p. 429 of 579). Plaintiff's back pain and diagnosis remained unchanged (Docket No. 14, p. 429 of 579). Plaintiff did not complain of right shoulder pain again until July 2011, at which point she was scheduled for surgery (Docket No. 14, p. 425 of 579). From February to December 2011, Plaintiff rated her lower back pain anywhere from a five to a nine out of a possible ten (Docket No. 14, pp. 425-28, 501-524 of 579).

On January 2, 2012, Plaintiff reported constant back pain, rated at a six out of a possible ten (Docket No. 14, p. 526 of 579). Dr. Ahmad noted that Plaintiff had tenderness over her bilateral paravertebral muscles, taut bands of muscle palpable along her left lumbar paraspinals, and her range of motion was restricted secondary to pain (Docket No. 14, p. 528 of 579). These findings remained unchanged until June 2012 (Docket No. 14, pp. 530-32, 536-38, 541-43, 546 of 579). On June 13, 2012, Plaintiff rated her back pain as a nine out of a possible ten (Docket No. 14, p. 552 of 579). On

13

July 6, 2012, Plaintiff told Dr. Ahmad that she was taking up to four Percocet per day (Docket No. 14, p. 556 of 579). By September 2012, Plaintiff reported that her pain was a five out of possible ten and noted that her back pain was "fairly well controlled over the past month" (Docket No. 14, p. 550 of 579). In October 2012, Plaintiff again indicated that her pain was fairly well controlled, but still rated it as a nine out of a possible ten (Docket No. 14, p. 556 of 579). Plaintiff's most recent diagnosis from Dr. Ahmad included degeneration of the lumbar or lumbosacral intervertebral disc, chronic pain syndrome, and primary localized osteoarthrosis (shoulder region) (Docket No. 14, p. 571 of 579).

On December 5, 2011, Dr. Ahmad completed a medical source assessment. He limited Plaintiff to: (1) lifting and/or carrying no more than five pounds; (2) standing and/or walking for one hour per day, and only fifteen minutes without interruption; and (3) sitting for two hours per day, and only thirty minutes without interruption (Docket No. 14, pp. 497-98 of 579). Dr. Ahmad found Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl (Docket No. 14, p. 498 of 579). Dr. Ahmad also found Plaintiff's ability to reach and push/pull to be affected by her impairments (Docket No. 14, p. 499 of 579).

### 4.  CONSULTING PHYSICIANS

On April 22, 2009, Plaintiff was referred to Dr. Jeffrey Cochran, DO ("Dr. Cochran") for evaluation (Docket No. 14, p. 487 of 579). Although she complained of scoliosis, Dr. Cochran found Plaintiff to be very flexible (Docket No. 14, p. 487-88 of 579). Dr. Cochran diagnosed Plaintiff with degenerative disease of the lumbar spine, levoscoliosis, and foraminal stenosis at the L2-3 and L3-4 vertebrae (Docket No. 14, p. 488 of 579). Plaintiff returned to Dr. Cochran on April 6, 2011, complaining of right shoulder pain (Docket No. 14, p. 483 of 579). Upon examination, Dr. Cochran found Plaintiff to have a good range of motion, mild AC joint tenderness upon palpation, and severe

14

shoulder pain with abduction and external rotation (Docket No. 14, p. 484 of 589). With regard to Plaintiff's back, Dr. Cochran found no evidence of scoliosis or somatic dysfunction and found Plaintiff to have a good axial spine range of motion that was symmetric as well as a full and symmetric range of motion in her lower extremities (Docket No. 14, p. 484 of 589). Dr. Cochran diagnosed Plaintiff with right glenohumeral and AC joint arthrosis, right shoulder impingement syndrome, a right shoulder partial articular sided rotator cuff tear, and a right shoulder posterior labral tear with a paralabral cyst (Docket No. 14, pp. 484-85 of 579).

On December 28, 2011, Plaintiff was referred to Dr. Georges Z. Markarian, MD ("Dr. Markarian") (Docket No. 14, p. 514 of 579). Plaintiff complained of lower back pain, which she rated at a six out of a possible ten (Docket No. 14, p. 514 of 579). Plaintiff was able to heel-toe walk without difficulty and her muscle strength was five out of five bilaterally (Docket No. 14, p. 514 of 579). Plaintiff's gait was slow but otherwise normal and she had a full range of motion with flexion and only slightly decreased range with lumbar extension (Docket No. 14, p. 514 of 579). Dr. Markarian referred Plaintiff to the Cleveland Clinic (Docket No. 14, p. 515 of 579).

On February 8, 2012, Plaintiff saw Dr. Ajit A. Krishnaney, MD ("Dr. Krishnaney") at the Cleveland Clinic (Docket No. 14, p. 517 of 579). Plaintiff complained of lower back pain that radiated to her legs (Docket No. 14, p. 517 of 579). Dr. Krishnaney diagnosed Plaintiff with idiopathic scoliosis with back pain and occasional intermittent radiculopathy (Docket No. 14, p. 518 of 579).

### 4. CONCORDE THERAPY GROUP

Plaintiff went through multiple rounds of physical therapy from July 2009 through January 2011 (Docket No. 14, pp. 326, 374-82, 390-406 of 579). Plaintiff terminated her own care on at least two occasions, December 15, 2009 (Docket No. 14, p. 396 of 579), and March 24, 2010 (Docket No.

15

14, p. 391 of 579). Staff discharged Plaintiff on January 4, 2011, citing a plateau in her progress and no benefit from therapy (Docket No. 14, p. 390 of 579). Plaintiff's discharge prognosis was fair (Docket No. 14, p. 390 of 579).

**5. MEDICAL TESTING**

Plaintiff underwent numerous x-rays, CT scans, and MRIs for her back and shoulder pain. On February 28, 2008, an x-ray of her lumbar spine showed levoscoliosis with mild to moderate degenerative changes (Docket No. 14, p. 450 of 579). There was no acute abnormality (Docket No. 14, p. 450 of 579). An electrodiagnostic study performed on Plaintiff's right lower extremity on July 8, 2008, produced normal results (Docket No. 14, p. 369 of 579). The next day, July 9, 2008, Plaintiff underwent an MRI of her lumbar spine (Docket No. 14, p. 449 of 579). The scan showed severe rotary levoscoliosis resulting in asymmetric degenerative and hypertrophic changes, an asymmetric disc osteophyte complex on the right at the L2-3 and L3-4 vertebrae with significant foraminal narrowing, and degenerative changes at other levels (Docket No. 14, p. 449 of 579).

Some months later, in April 2009, Plaintiff underwent an x-ray of her spine, which showed s-shaped thoracolumbar scoliosis (Docket No. 14, p. 486 of 579). Results from June 2009 electrodiagnostic testing were normal (Docket No. 14, p. 361 of 579). On October 14, 2010, Plaintiff had an MRI of her right shoulder (Docket No. 14, p. 446 of 579). The scan showed advanced glenohumeral arthritis, spurring of the head of the humerus, partial tearing of the supraspinatous tendon, and intra-articular loose bodies (Docket No. 14, p. 446 of 579). On August 16, 2011, Plaintiff had an MRI of her lumbar spine, which showed significant degenerative changes at the L2-3 and L3-4

16

vertebrae, likely due to scoliosis (Docket No. 14, p. 445 of 579).[4]

## C.    EVALUATIONS

### 1.    PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On December 27, 2009, Plaintiff underwent a Physical Residual Functional Capacity

Assessment with state examiner Dr. William Bolz, MD ("Dr. Bolz") (Docket No. 14, pp. 299-306 of

579). Dr. Bolz found Plaintiff could: (1) occasionally lift and/or carry twenty pounds; (2) frequently

lift and/or carry ten pounds; (3) stand and/or walk for a total of six hours during an eight-hour

workday; (4) sit for a total of six hours during an eight-hour workday; and (5) engage in unlimited

pushing and pulling (Docket No. 14, p. 300 of 579). Dr. Bolz also limited Plaintiff to no climbing of

ladders, ropes, or scaffolds, and only occasionally stooping or crouching (Docket No. 14, p. 301 of

579). Aside from avoiding all exposure to hazards, Plaintiff had no manipulative, visual,

communicative, or environmental limitations (Docket No. 14, pp. 302-03 of 579).

### 2.    PSYCHOLOGICAL EVALUATION

On November 18, 2009, Plaintiff underwent a psychological evaluation with Dr. Michael J.

Harvan, Ph.D ("Dr. Harvan") (Docket No. 14, pp. 278-84 of 579). Plaintiff admitted to previous heavy

alcohol consumption but denied a current problem (Docket No. 14, p. 279 of 579). During the

examination, Plaintiff's thoughts were goal-oriented and her responses to questions were relevant

(Docket No. 14, p. 280 of 579). Plaintiff reported daily crying spells, anxiety, and preoccupied

thoughts (Docket No. 14, pp. 280-81 of 579). Plaintiff was oriented to person, place, time, and

---

[4] It should be noted that in September 2008 Plaintiff experienced a generalized tonic-clonic seizure with urinary incontinence (Docket No. 14, p. 249 of 579). Plaintiff's toxicology report was positive for THC, opiates, benzodiazepines, and tricyclics, all of which were prescribed except for the THC (Docket No. 14, p. 250 of 579). A CT scan of her head was normal, as was an electroencephalogram ("EEG") (Docket No. 14, pp. 250, 257, 258 of 579). An October 3, 2008, MRI of her brain was also unremarkable (Docket No. 14, p. 448 of 579).

situation (Docket No. 14, p. 281 of 579). She was able to generally focus her attention and concentrate

and could follow simple, but not more complex, instructions (Docket No. 14, p. 281 of 579). Dr.

Harvan reported that Plaintiff's level of functioning was likely in the average to low-average range

(Docket No. 14, p. 282 of 579).

Based on his evaluation, Dr. Harvan diagnosed Plaintiff with dysthymic disorder,[5] alcohol

dependance (sustained full remission), generalized anxiety disorder, and assigned her a Global

Assessment of Functioning ("GAF")[6] score of sixty-two (Docket No. 14, p. 283 of 579). Dr. Harvan

concluded that Plaintiff was: (1) mildly impaired in her ability to understand and follow instructions;

(2) mildly impaired in her ability to maintain attention to perform simple and multi-step, repetitive

tasks; (3) mildly impaired in her ability to relate to others, including coworkers and supervisors; and

(4) moderately impaired in her ability to withstand the stress and pressures associated with day-to-day

work activity (Docket No. 14, p. 283 of 579).

### 3.    PSYCHIATRIC REVIEW TECHNIQUE

On November 25, 2009, Plaintiff underwent a Psychiatric Review Technique with state

examiner Dr. Tonnie Hoyle, Psy.D ("Dr. Hoyle") (Docket No. 14, pp. 285-98 of 579). Dr. Hoyle

diagnosed Plaintiff with Dysthymic Disorder, Generalized Anxiety Disorder, and Alcohol Abuse in

---

[5] A disorder of the mood, less severe than a major depression, marked by a loss of interest in activities previously enjoyed, described by the patient as a feeling of being in the dumps, and lasting more than two years. ATTORNEYS' DICTIONARY OF MEDICINE, D-37210 (2009).

[6] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of sixty-two indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

reported remission (Docket No. 14, pp. 288-93 of 579). In assessing "Paragraph B" criteria,[7] Plaintiff was found to have mild limitations with regard to activities of daily living and maintaining concentration, persistence, and pace, but no difficulties in maintaining social functioning or episodes of decompensation (Docket No. 14, p. 295 of 579). Dr. Hoyle did not find the presence of any "Paragraph C" criteria[8] (Docket No. 14, p. 295 of 579).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at

---

[7] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[8] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730

20

(*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Robinson

made the following findings:

1.   Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2010.

2.   Plaintiff has not engaged in substantial gainful activity since January 31, 2007, the alleged onset date.

3.   Plaintiff has the following severe impairments: scoliosis, joint arthrosis, shoulder impingement syndrome, degenerative disc disease, and tendinitis.

6.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

7.   Plaintiff has the residual functional capacity to perform sedentary work with the following additional limitations: (1) stand and walk for a total of four hours per day; (2) lifting no more than five pounds; (3) occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; (4) frequently stoop but only occasionally kneel, crouch, or crawl; (5) unlimited reaching except for only occasional right overhead reaching; (6) only jobs that can be performed while occasionally using a hand-held assistive device for ambulation; (7) no exposure to workplace hazards such as unprotected machinery and heights; and (8) no work involving rapid production rate or pace work.

8.   Plaintiff is unable to perform past relevant work.

9.   Plaintiff was 38 years old, which is defined as a younger individual, on the alleged disability onset date. She has since changed age category to a younger individual age 45-49.

10.  Plaintiff has at least a high school education and is able to communicate in English.

11.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills.

12.  Considering Plaintiff's age, education, work experience, and residual functional

capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

13.     Plaintiff has not been under a disability, as defined in the Social Security Act, from January 31, 2007, through the date of this decision.

(Docket No. 14, pp. 16-25 of 579). ALJ Robinson denied Plaintiff's request for DIB and SSI benefits

(Docket No. 14, p. 25 of 579).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-

33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's

conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27

(6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial

evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028,

1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because

there exists in the record substantial evidence to support a different conclusion . . . This is so because

there is a 'zone of choice' within which the Commissioner can act, without the fear of court

interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.

2001) (citations omitted)).

## VII. DISCUSSION

### A.   PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff alleges that the ALJ erred by failing to: (1) follow the treating physician rule with regard to Drs. Dang and Ahmad; (2) find Plaintiff's alleged depression and anxiety to be severe impairments; (3) state valid reasons for discrediting Plaintiff; and (4) properly conduct a Step Five analysis (Docket No. 15).

### B.   DEFENDANT'S RESPONSE

Defendant disagrees with Plaintiff's assignments of error, arguing that the ALJ's decision regarding Drs. Dang and Ahmad, as well as her assessment of Plaintiff's anxiety and depression were based on substantial evidence (Docket No. 16). Defendant also argues that ALJ Robinson sufficiently assessed Plaintiff's credibility and properly conducted a Step Five analysis (Docket No. 16).

### C.   DISCUSSION

#### 1.   DRS. DANG AND AHMAD

In her first assignment of error, Plaintiff alleges that the ALJ failed to abide by the treating physician rule and assign the opinions of her treating physicians, Drs. Dang and Ahmad, controlling weight (Docket No. 15, pp. 15-19 of 24). Defendant disagrees, arguing that ALJ Robinson's decision, when considered as a whole, contains sufficient  information to discredit the opinion of both physicians (Docket No. 16, pp. 12-16 of 19). After review of the ALJ's decision and the entire record, the Magistrate finds that Plaintiff is partially correct.

##### a.   TREATING PHYSICIAN RULE

The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

23

requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.

[T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted).

Before according any weight to the opinions of a claimant's physicians, the ALJ must first determine which physicians he will consider to be "treating sources." "A physician is a treating source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation that is typical for the treated conditions." *Blakley*, 581 F.3d at 407 (*quoting* 20 C.F.R. § 404.1502) (internal quotations omitted)).

24

Here, it is clear that both Drs. Dang and Ahmad are Plaintiff's treating physicians. Plaintiff made multiple visits to each physician and each physician provided extensive treatment, including prescribing medication (Docket No. 14, pp. 245-579 of 579). Plaintiff's most recent visit to Dr. Dang was August 5, 2011, approximately four months before the hearing (Docket No. 14, p. 456 of 579). Plaintiff continued to see Dr. Ahmad long after the hearing with her most recent appointment occurring on November 5, 2012 (Docket No. 14, p. 573 of 579). Therefore, both Dr. Dang and Dr. Ahmad are Plaintiff's treating physicians. As such, their opinions are entitled to controlling weight *unless* they are inconsistent with the other medical evidence of record. *See Blakley*, 581 F.3d at 506-07.

### b.    DR. DANG

ALJ Robinson makes very little mention of Dr. Dang in her opinion. She first references his treatment of Plaintiff in the context of Plaintiff's alleged depression and anxiety, for which Dr. Dang provided medication management (Docket No. 14, p. 19 of 579). The ALJ also notes that Dr. Dang ordered an x-ray of Plaintiff's lumbar spine after Plaintiff began complaining of constant back pain (Docket No. 14, p. 22 of 579). However, ALJ Robinson fails to articulate the weight given to Dr. Dang's opinion, if any (Docket No. 14, pp. 16-25 of 579). Nor does the ALJ discuss Plaintiff's treatment relationship or the frequency of examination with Dr. Dang (Docket No. 14, pp. 16-25 of 579). Although the ALJ does mention the opinion of state examiners Drs. Harvan and Hoyle in her opinion with regard to Plaintiff's alleged anxiety and depression, she fails to discuss how Dr. Dang's opinion fits in with these opinions, if at all (Docket No. 14, p. 16-25 of 579). Therefore, given Dr. Dang's status as a treating physician, his opinion is entitled to controlling weight. Absent such weight, the ALJ was required to undertake further analysis to properly explain her decision. ALJ Robinson

25

failed to do so.

It is a fundamental principle of administrative law that an agency is bound to follow its own regulations. *Wilson*, 378 F.3d at 545. "An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process." *Id.* (*citing Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (internal citations omitted)). As set forth by the Sixth Circuit, "[w]e do not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Hensley v. Astrue*, 573 F.3d, 263, 267 (6th Cir. 2009).

Based on the ALJ's failure to abide by the requirements of the treating physician rule, the Magistrate recommends remand to the Commissioner for further discussion and analysis of Dr. Dang's opinion.

### c.    DR. AHMAD

Plaintiff also alleges that the ALJ failed to accord proper weight to the opinion of pain management physician Dr. Ahmad (Docket No. 15, pp. 15-19 of 24). According to a December 2011 medical source assessment by Dr. Ahmad, Plaintiff could only lift and/or carry five pounds, stand and/or walk for a total of one hour during an eight-hour workday, and sit for a total of two hours during an eight-hour workday (Docket No. 14, pp. 497-98 of 579). Plaintiff could never climb, balance, stoop, crouch, kneel, or crawl, and was limited in reaching and pushing/pulling (Docket No. 14, pp. 498-99 of 579). ALJ Robinson gave little weight to this opinion, citing Plaintiff's own report of daily activities and work activity after the onset of her alleged impairments as justification (Docket No.

26

14, p. 23 of 579).

Plaintiff points out the ALJ's statement that, based on Dr. Ahmad's opinion, Plaintiff "would have to lie down approximately 10 hours during a 16-hour day" (Docket No. 14, p. 23 of 579). While the ALJ does not provide any explanation as to how she arrived at this conclusion, this is not the only evidence that ALJ Robinson relies upon in assigning Dr. Ahmad's opinion little weight.

As the ALJ noted, Plaintiff saw Dr. Ahmad regularly, enough to be considered her treating physician (Docket No. 14, pp. 22-23 of 579). Furthermore, as the ALJ also noted, the balance of the evidence contained in the record seemed to contradict Dr. Ahmad's medical source statement findings (Docket No. 14, p. 23 of 579). Plaintiff, by her own admission, noted that, although she sometimes required assistance, she could perform many household chores, including sweeping and carrying laundry (Docket No. 14, pp. 23, 197, 225 of 579). Plaintiff also indicated that she went shopping one to two times per week (Docket No. 14, pp. 23, 193, 225 of 579). Plaintiff reported being able to hang Christmas decorations as recently as December 2010 (Docket No. 14, pp. 23, 431 of 579). On several occasions, Plaintiff reported great improvement with physical therapy and prescription medication (Docket No. 14, pp. 22, 270, 336, 363, 436, 437, 440, 443 of 579). During a consultation with orthopedic surgeon Dr. Cochran in April 2009, Plaintiff was found to be very flexible (Docket No. 14, pp. 22, 488 of 579). Dr. Cochran noted that there was no need for orthopedic back surgery (Docket No. 14, pp. 22, 488 of 579). In a December 2011 consultation with Dr. Markarian, Plaintiff was able to heel-toe walk without difficulty, had a slow but otherwise normal gait, had good muscle strength, and a nearly full range of motion (Docket No. 14, pp. 22-23, 514 of 579). Furthermore, Plaintiff was able to work a sedentary job long after the alleged onset of her disability (Docket No. 14, pp. 23, 244 of 579).

In her Brief on the Merits, Plaintiff argues that her children helped her with chores around the

house and she worked only one day per week for four to five hours (Docket No. 15, p. 16 of 24). While this may be true, it is well established that "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton*, 246 F.3d at 772). Here, while there may indeed be evidence, although somewhat minimal, supporting an opposite conclusion, the Magistrate finds that ALJ Robinson presented sufficient enough evidence to support her assignment of little weight to Dr. Ahmad's opinion. As such, the Magistrate recommends that the decision of the Commissioner with regard to Dr. Ahmad be affirmed.

### 2.   ANXIETY AND DEPRESSION AS NON-SEVERE IMPAIRMENTS

In her second assignment of error, Plaintiff argues that the ALJ improperly deemed her alleged depression and anxiety as "non-severe" impairments (Docket No. 15, p. 19 of 24). Defendant disagrees, arguing that the ALJ based this decision on substantial evidence (Docket No. 15, pp. 16-17 of 19). Defendant is correct.

To be severe, an impairment or combination of impairments must significantly limit a claimant's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1527(c), 416.920(c). An impairment qualifies as "*not* severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 691 (6th Cir. 1985) (*quoting Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (emphasis added). In her opinion, ALJ Robinson noted that Plaintiff had been treated with prescription medication for depression and anxiety with Dr. Dang, but also noted that Plaintiff had not sought

treatment with a psychologist, psychiatrist, or counselor (Docket No. 14, p. 19 of 579). During a

November 2009 psychological evaluation, state examiner Dr. Harvan noted that Plaintiff was

intelligible, oriented to person, place, time, and situation, and generally able to focus her attention and

concentrate (Docket No. 14, pp. 280-81 of 579). Dr. Harvan diagnosed Plaintiff with dysthymic

disorder, alcohol dependence in sustained full remission, and generalized anxiety disorder, and

assigned her a GAF score of sixty-two, which indicates only some mild symptoms with the ability to

generally function pretty well (Docket No. 14, p. 283 of 579). Plaintiff was only mildly limited in her

ability to: (1) understand and follow instructions; (2) maintain attention and perform simple and multi-

step, repetitive tasks; and (3) relate to others, including coworkers and supervisors (Docket No. 14, p.

283 of 579). She was moderately impaired in her ability to withstand the stress and pressures

associated with day-to-day work activity (Docket No. 14, p. 283 of 579). A Psychiatric Review

Technique also done in November 2009 supported these findings (Docket No. 14, pp. 285-98 of 579).

Based on the findings of these state examiners, ALJ Robinson determined Plaintiff's anxiety

and depression to be "non-severe" (Docket No. 14, p. 19 of 579). Plaintiff takes issue with this finding,

noting that neither consultative examiner had the benefit of examining Plaintiff's own physician's

records (Docket No. 15, p. 19 of 24). Plaintiff's only treatment for anxiety and depression was through

Dr. Dang, beginning in March 2006 (Docket No. 14, p. 423 of 579). By August 2011, Plaintiff's

medications for depression and anxiety included only Xanax, which Dr. Dang stated Plaintiff was to

take as needed (Docket No. 14, pp. 455, 457 of 579). During this appointment, Plaintiff was prescribed

Celexa, twenty milligrams per day (Docket No. 14, p. 457 of 579). Plaintiff never sought treatment

with any mental health professional for her alleged mental health impairments (Docket No. 14, pp.

245-579 of 579). Furthermore, when asked what prevented her from returning to work, Plaintiff cited

29

only her back, leg, and shoulder pain, and made no mention of her alleged anxiety and depression
(Docket No. 14, pp. 50-52 of 579). This evidence, all of which was included in the ALJ's decision,
supports a finding that Plaintiff's anxiety and depression were not, in fact, severe impairments as that
term is defined under Social Security Regulations.

Furthermore, *even if* ALJ Robinson should have found these conditions to be severe, such error
is harmless. Step two of the sequential evaluation process is a "de minimis hurdle in the disability
determination process" that is intended "to screen out totally groundless claims." *Knox v. Astrue*, 2011
U.S. Dist. LEXIS 23611, *24 (N.D. Ohio March 9, 2011). Once an ALJ determines the claimant
suffers from *any* severe impairment at step two, the analysis automatically proceeds to step three. *Id*.
Failure "to identify other impairments, or combinations of impairments, as severe in step two would
only be harmless error. *Id*. at *24-25 (*citing Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir.
2008).

Here, ALJ Robinson found Plaintiff suffered from a variety of severe impairments, including
scoliosis, joint arthrosis, shoulder impingement syndrome, degenerative disc disease, and tendinitis
(Docket No. 14, p. 18 of 579). Therefore, Plaintiff's application for disability automatically proceeded
to step three. The ALJ's failure to find Plaintiff's alleged depression and anxiety to be severe is
irrelevant and resulted in only harmless error. As such, Plaintiff's second assignment of error is
without merit and the Magistrate recommends that the decision of the Commissioner as to Plaintiff's
severe impairments be affirmed.

### 3.    PLAINTIFF'S CREDIBILITY

In her third assignment of error, Plaintiff alleges that the ALJ improperly discredited her
subjective statements and allegations of pain (Docket No. 15, pp. 20-21 of 24). Defendant disagrees,

arguing that ALJ Robinson provided substantial evidence to support her finding concerning Plaintiff's credibility (Docket No. 16, p. 17 of 19). Defendant is correct.

Under Social Security regulations, a claimant's subjective complaints of pain or other symptoms are not, on their own, conclusive evidence of a disability. 42 U.S.C. § 423(d)(5)(A). However, a claimant may experience pain severe enough to restrict his ability to work. In such cases, an ALJ must evaluate the credibility of a claimant's allegations. Social Security Ruling 96-7p provides the framework under which an ALJ must analyze a claimant's credibility. The Ruling states, in part:

> In determining the credibility of a claimant's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

> It is not sufficient for the adjudicator to make a single, conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible. It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 SSR LEXIS 4, *2-4 (July 2, 1996). The ALJ's findings as to a claimant's credibility are entitled to deference. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 736 (N.D. Ohio, 2005).

Here, ALJ Robinson accorded Plaintiff's subjective statements only partial credibility (Docket No. 14, p. 21 of 579). The ALJ noted that, despite Plaintiff's continued complaints of back, leg, and shoulder pain, Plaintiff often reported that she was improving with physical therapy and medication management (Docket No. 14, p. 22 of 579). Plaintiff once reported that the epidural injections reduced

31

her pain from a seven to a three out of a possible ten (Docket No. 14, p. 365 of 579). Further, Plaintiff's own account of her daily activity did not correspond to Dr. Ahmad's severe physical restrictions issued in December 2011 (Docket No. 14, p. 23 of 579). Plaintiff also had the ability to work a sedentary job with no further restrictions long after Plaintiff's alleged disability onset date (Docket No. 14, p. 244 of 579).

Based on a review of the record, the Magistrate finds that the ALJ had substantial evidence to assign Plaintiff's subjective statements only partial credibility. Therefore, Plaintiff's third assignment of error is without merit and the Magistrate recommends that the decision of the Commissioner on this issue be affirmed.

### 4.    STEP FIVE ANALYSIS

Finally, Plaintiff alleges the ALJ did not meet her burden at step five of the sequential evaluation (Docket No. 15, pp. 21-23 of 24). Specifically, Plaintiff claims that the ALJ, in rendering her final assessment of Plaintiff's residual functional capacity, did not make that decision using the hypothetical questions "which most accurately described the way in which [Plaintiff] would be able to function in a workplace" (Docket No. 15, p. 22 of 24). Plaintiff's argument is without merit.

In the Sixth Circuit, in order to be considered substantial evidence, a VE's testimony must be based on a hypothetical question which accurately portrays the claimant's physical and mental impairments. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). However, it is also "well established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact" into the hypothetical question. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

ALJ Robinson posed essentially six hypothetical questions to the VE which limited Plaintiff to

32

both light and sedentary work with further restriction on her general ability to climb, reach with her right hand, be exposed to workplace hazards, lift, stand and/or walk, sit, walk without assistance, and maintain consistent attendance due to medical issues (Docket No. 14, pp. 79-98 of 579). Plaintiff alleges that, in her final assessment of Plaintiff's residual functional capacity, ALJ Robinson failed to consider Plaintiff's need to miss four or more days of work per month, as noted by Dr. Ahmad, thus prohibiting Plaintiff from maintaining substantial gainful employment (Docket No. 15, p. 22 of 24). However, examination of Dr. Ahmad's medical source statement reveals no such limitation (Docket No. 14, pp. 497-99 of 579). In fact, nothing in the record, aside from Plaintiff's own testimony that she would frequently call off work, supports such a work-prohibitive limitation (Docket No. 14, pp. 245-579 of 579). As stated above, an ALJ is only required to incorporate into her hypothetical question those "limitations accepted as credible by the finder of fact." *Casey*, 987 F.2d at 1235. Therefore, Plaintiff's fourth assignment of error is without merit and the Magistrate recommends that the decision of the Commissioner be affirmed.

### VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends that the decision of the Commissioner be affirmed in part and reversed and remanded in part, pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the Magistrate recommends that the Commissioner discuss the weight attributed to Dr. Dang's opinion as a treating physician and conduct any further necessary analysis.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   January 3, 2014

33

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.